We'll hear an argument on the case of Tahoe Tavern Property Owners Association v. Forest Service. Good morning, Your Honors. I'm Antonio Rossman, and I represent the Tahoe Tavern and Tavern Shores Property Owners Association, the appellants in this proceeding, and the plaintiffs below. Nearly 40 years ago, the owners of a public park and federal authorities collaborated on a decision to build a federally funded highway through that park. What stood in the way of that, and dramatically has influenced our law since, was a citizen's group that stood up and said, Section 4F means what Congress intended it to be. Now we are here in the same situation where it has been up to the property owners. And let me just emphasize briefly that they did not come to this proceeding as initiates or novitiates in this process. As the record shows, and the Forest Service recognized in 1986, these property owners actually rented part of the 64 acres in order to preserve it in its natural and unsullied state and keep out inappropriate vehicles to enable the public to use it for the intended purposes of enjoying the environment of Lake Tahoe. On the other side, we have the federal respondents. And of course today, because this is a Section 4F case, we have to focus on the Federal Transit Administration as the surrogate of the Secretary of Transportation. The federal defendants in this case, and Forest Service of course is implicated because they are the owner of the property and they granted the lease to Placer County, the permit to Placer County, have constructed a post hoc rationalization to attempt to establish that at the time this property was established as a recreational use, there also had been formally reserved a transportation use that must be honored. When do you think the relevant time period is? Is it when the Forest Service acquired it? Yes, sir. In thinking about this case, Your Honor. So don't we start the clock from there and we determine what the Forest Service did right after that period of time? Your Honor, that is exactly right. I mean, the Forest Service came into this ownership in 1984 based on an environmental impact statement prepared in 1983. And in reflecting on the arguments that have taken this case up to this morning, where the respondents have talked about things that have happened afterwards, although I would emphasize that those subsequent arguments are not inconsistent with our basic position. Like a referee in soccer who freezes offside at the moment the ball is kicked, we have to freeze this case in 1984. And the EIS that was prepared in 1986 was very express. The preferred alternative is to transfer this land to the United States Forest Service as a recreational facility. What was not done at that time was anything close to a formal reservation of any transportation use. There was not, for example, envisioning a two-acre parcel that would be covered by a bus terminal. I might emphasize that may seem insignificant, but I think the Port Authority bus station in New York is probably not more than twice that size. It was not envisioned that this parking lot to go with the bus station would not serve recreational users as if the Forest Service had developed it as part of its forest plan. However, ten years later, there was a proposal that Tahoe City Merchant Parking could be accommodated if a special permit or exception were made. And that is the genesis of the project that we have today, a project that would incidentally require two people to be on site at all times to prohibit the use of this facility by those who chose to go rafting on the Truckee River. I understand that the scope of the project has changed, but wasn't it envisioned just after the Forest Service acquired it within several years that there would be some parking, some transportation? Yes, there is some parking there, Your Honor. There is a parking lot now that serves a valid recreational purpose. It's conducted by the Forest Service. It enables people to raft on the Truckee River. It enables people to use the Tahoe Rim Trail. It enables young families to use the bicycle paths that are on the property itself for recreation in that place. What was envisioned in 1983, if one wants to try to even conjure some sort of formal reservation, was a bus station along Highway 89 across the river. If I can make a vernacular reference in front of what is now the Albertsons food store, the Albertsons supermarket, there was nothing, quote, reserved on the main recreational portion of the land that would approach the dimension of what we have here. And it's interesting that we focus. Really, the case boils down, ironically, to a record of many thousands of pages. In many respects, the case boils down to four pages. The advice that the Federal Transit Administration gave in June of 2000 when they inquired of the Forest Service whether Section 4F would apply, and that advice focused on proving that there had been no change in the official plan at the beginning. It talked of things like strips of land and right-of-way. In short, it sought a fact-based and site-based reservation to define how much of this 64 acres was, in fact, jointly planned for a transportation purpose. And really, the Federal guidance under the Section 4F policy paper repeats the same language. The only reason, incidentally, Your Honors, that the Federal Transit Administration had to prepare that letter in June of 2000 was because the homeowners raised the issue of Section 4F. It wasn't even a consideration by these agencies until the homeowners reserved it. And so the Forest Service gave some answers. I will just use the polite language, inaccurate history. And then the Federal Transit Administration came back and said, yes, you have shown us that from the time this property came into your ownership, there was this reservation for a two-acre bus station on the main portion of the 64 acres. Your Honors, the only justification that they could have is if the history actually was that fantasy. But that was not the history. And so we come right within the language of Overton Park. It is almost as if the Placer County staff had read Overton Park and said, can we dare to challenge this mandate? The two grounds given for selecting this site is, one, it is free, and two, we don't have to displace other businesses in Tahoe City in order to implement what our own Supplemental Environmental Impact Report actually show are superior sites for a transit terminal that is actually serving Tahoe City. And, Your Honors, in a nutshell, that is truly our case. It needs not much more elaboration. There are arguments that have been advanced about constructive use versus direct use. This circuit wisely restricted the joint planning exception to constructive use to prevent exactly what is being proposed in this case. What is being proposed by the respondents in this case is a floating 4F exception because a dot on a map in 1983 identified a bus station as a potential use of part of the property. That somehow gives them license then to float in both time and space over the entire 64 acres, an argument that it can be dedicated to this, if you will, nonrecreational transportation use. Your Honors, that is our 4F case. If the Court agrees with us on Section 4F, then we ask the Court to agree with Judge Carlton that the NEPA analysis was clearly faulty because it cut off the alternatives analysis, as the county counsel of Placer County was honest enough to tell his board, a case you cannot win if you stop looking and don't look at off-site alternatives. And so the EIS under NEPA also has to be set aside so that the Forest Service can make the correct decision with the application of Section 4F. I will reserve the rest of my time for rebuttal, Your Honor. I just want to emphasize that in this case there has not been the 4F analysis, so we're not even talking about the two factors, which we don't know. If it's done, there may be an argument that could be made, but we haven't even gotten that far. Thank you, Counsel. Thank you, sir. Good day, Your Honors. I'm Yoshinori Himel, representing the Federal Transit Administration and the U.S. Forest Service. The appellees have divided their time, 15 minutes to myself and 15 minutes to Placer County. This is a case. How much time? I'm sorry, you only allocated a total of 20 minutes. I misspoke. Five minutes to Placer County. All right. Your co-counsel is brightening up at your suggestion. This is a case about a transit project planned consistently to reduce auto emissions, air and water pollution by getting business and recreational drivers out of their cars and to improve public access to recreation on the 64-acre tract and in the Lake Tahoe Basin. I will mention a few of Tavern's factual misconceptions and two legal points on the meaning of Section 4F's language of use of a recreation area. The two legal points are the joint planning exception to Section 4F extends to physical occupancy and applies to the transit center here, and under the temporary use exception, an exception to 4F independent of the joint planning exception, the Forest Service intended for recreational uses to yield to transit for things like a few yards realignment of a bike trail. It is, in factual matters, it is untrue that Placer County admitted that the city core locations that they advocate, Taverns advocate, were a superior transportation project or superior sites. The transit center's purposes make the 64 acres a central location. The County Department of Public Works testimony at ER 153, lines 3 to 6, said that the 64-acre site has the best combination of access to downtown, to existing transit, and to the recreational trails. The testimony at ER 182, lines 15 to 22, shows the advantage of the 64 acres, quote, centralized location. For conference groups that include hikers, rafters, and cyclists. And business employees. I'm sorry? And business employees, right? Yes, indeed. Well, I find this a little bit ironic that we're talking about recreational use when you do have part of the parking lot that's dedicated not only to employees, but people are going to patrol and make sure that recreational users don't interfere with the employee. That's another misconception that the, to quote opposing counsel here, the parking lot will not serve recreation. There are two misconceptions there. One is that there is no facility already to serve car-driving recreationers. There is. It's already on the property. And there's no protest of that parking lot. The second problem with that is that it totally ignores recreationers who get to the site and through the site by riding transit. They can take their bicycles, put them on the bike racks of the buses, and park them in bike racks at the transit center. The skiers can lock up their skis. They can put the skis on ski racks and buses, lock them up at the site. I don't think anybody's disputing that, though, right? Nobody's disputing that that's going to occur. The question is then the dedication of a substantial part of the parking lot for purely private business use for employees, not for recreational purposes. It's not – well, these are – it's not a dedicated part of the parking lot. It's just an estimate of capacity. But this is not a project for the sole purpose of benefiting private business. This is a project that is invested with the public interest, first in keeping the famous clarity of the lake from diminishing more through air pollution and reducing carbon emissions by automobiles, and also for both on-site and off-site recreation using transit. There is a transit system already in place that takes people to ski areas, for example, and this would facilitate it, this transit center. Let me ask a different question. Do you agree that the relevant time period for assessing the joint use exception is when the Forest Service acquired it from the Bureau of Rec or before? It is – the assessment of joint planning and the assessment of temporary use stem from approximately the time of acquisition, although history before that is relevant. And the first opportunity for planning by the Forest Service was not the instant of acquisition of 1984, but in 1986 when its first formal plan was promulgated. Actually, I'm addressing the point that Judge Carlton made in one of his footnotes. I think it's footnote 20, that the legally relevant period for ascertaining the joint use is after the governmental entity acquires the property. I mean, both parties spent a lot of time on the history of this particular tract, but I'm not sure that's particularly relevant for the joint use exception analysis. Am I missing something? You've got the primary relevance, which is the continuous course of planning for joint use from the time that the Forest Service acquired the property. So in applying the joint use exception, we take it from the moment the Forest Service acquired it, regardless of what the Bureau of Rec had planned for before, right? That's your position? That's the main thing to look at. Of course, there was history going back even to 1974 when the regional government, the Tahoe Regional Planning Agency, put out the Tahoe City Urban Design Plan showing a transit station and parking. I understand that, but maybe I'm not making my point. I think it's useful to determine when we start the analysis. Is it your position that let's say Bureau of Rec had planned this transit center in detail. Once it transfers it to the Forest Service, doesn't the process start anew in terms of the joint use exception? Because that's the agency that's administering the property. Yes, it does. History is relevant, but that is the essence. It's interesting and it's informative perhaps, but okay. Yes, and starting from 1984, the 1986 plan for the 64 acres was just one in a chain of planning documents,  cooperating governmental documents that set up the area for both recreation and, let me quote, a transit terminal. And it said in that plan that regional transit improvements would help visitors enjoy rafting, bicycling on trails, and using the public beach. Then the 1986 plan also included parking and shuttle to ski areas for skiers and ski resort employees. This was nothing new. The 1987 TRPA plan area statement, 174, spoke of transit stations and terminals. A narrower EA in 1988 still mapped the parking lot and described another. The 1988 forest plan identified a transit terminal for the 64 acres. The 1994 TRPA Tahoe City Community Plan recommended a multimodal transit terminal on the 64 acres. By the way, the derogation of TRPA as an agency with no powers over the Forest Service land is overdrawn. TRPA's recommendations in the basin carry great weight, and the challenged EIS was jointly signed off on by TRPA. And as part of the chain, the 1997 EIS for the Lake of the Sky Interpretive Center on the beach property between the two taverns showed a transit terminal and community parking site, and I refer to SER 68, that diagram. Now, the statement by opposing counsel that the taverns rented part of the site to have the public enjoy it refers to the beachfront or lakeside portion of the property. And by the way, for easy reference, the federal appellees have put a couple of diagrams at the back of their brief showing, for example, the second of these shows the highway going down the middle, north to south, the riverside portion to the left of that highway, and the lakeside and a bit of the lake to the right with the tavern, one tavern on the north and the other tavern on the south side of that rather secluded and little-used lakeside portion. They rented the portion to have the public enjoy it. Well, that's not quite their motive. They've resisted improvements such as the transit center that would bring more members of the public to enjoy it and also improvements like the Lake of the Sky Interpretive Center that would bring more members of the public to enjoy that portion. Now, the two legal questions here are the joint planning and the temporary use exception. This court recognized in Sierra Club that while restricting use of a recreation area, Congress favored simultaneous planning of complementary facilities like roads and parks for more productive land use. Why do you think we should expand Sierra Club to include actual use as opposed to just limiting it to constructive use? For the same reason that this court, including Judge Nelson, originally decided Sierra Club. The leading case in the country on the joint planning exception, and that is because of the policy reasons. It should, Sierra Club and the Sierra Club principle is based on the fact that without the joint planning exception, whether it's constructive or actual use, the community has a perverse incentive to prohibit all recreational uses to allow it to build transportation. With the joint planning exception, scarce land can be productively used for recreation and transit. And I might note that the joint planning policy accords with many Western states' recreational use statutes, which are designed to encourage landowners to allow recreation on their land. The reasons for the joint planning exception apply here. The transit project complements recreation on the 64 acres. It will not destroy it, but will enhance it. It enhances recreational bicycling, of course, by accommodating transit riding cyclists and lets them disembark with their bikes, lock them up or ride them, park them to rest or wait. Now, Taverns takes the extreme legal position that the joint planning exception requires, quote, building roads and creating parks at the same time. This is in their reply brief, page 18. Building both simultaneously is not the test. It's planning for both. And here, of course, that happened from the beginning. You're down to about five minutes. Do you want to allow the county to argue? I will yield to the county. And I do ask that because Section 4F did not apply to the transit project, Judge Carlton's well-reasoned decision was correct and should be affirmed. Thank you. Thanks. Thank you. Richard Crabtree appearing on behalf of the County of Placer. A couple points quickly. There's been some references to the prohibition of recreational use of the transit center parking lot, and I wanted to make it clear that there will be a parking management plan that will ensure that the transit center parking is available for users of the transit center between 9 a.m. to 3 p.m., in other words, six hours a day, from June 30 through Labor Day. So parking of the transit center parking lot will be restricted to transit center users six hours a day, two months out of the year. The rest of the time, the parking will be available for recreational users. The EIR concluded that as a result of this project, recreational use of the site will increase, not decrease. I wanted to respond to the contention that it is somehow improper under CEQA to address the cost of alternatives. It is true that the EIR, EIS, identified the Albertsons site, a current location of a fairly large grocery store and other retail facilities. That's the best site if you leave cost aside, right? Yes, that was identified as the environmentally superior site. Right. And if you take a positive equation, this site comes in third, right? Yes, that's correct. It's been implied that CEQA somehow requires you to select the environmentally superior alternative and disregard costs, and that's not true at all. CEQA, in its guidelines, specifically calls for the addressing of feasibility and analyzing the feasibility of different alternatives. Well, but the cases in California seem to say that you take costs into account if it makes it infeasible to do it. Absolutely.  That's absolutely correct, Your Honor. So if it costs a lot more but is still not absolutely infeasible, then the California cases seem to say you've got to accept the expensive approach, don't you? Well, CEQA defines feasibility as capable of being accomplished in a successful manner within a reasonable period of time taking into account economic, environmental, legal, social, and technological factors. Now, both in the EIRN and the county's findings that were adopted, the county explained why it rejected the Albertson site as infeasible. Yes, but the California cases say it must be actually impractical. No, that's not true. The costs must make it impractical. I'm sorry. I respectfully disagree. There's a feasibility analysis. It doesn't require that the environmentally superior alternative be impossible. Quote, the issue is not whether the alternative is less profitable than the project proposed, but whether the reduced profitability of the alternative is sufficiently severe as to render it impractical to proceed with the project, California cases. It's got to be impractical to proceed or else you don't. And here the county reasonably concluded that it is impractical for the project to dislocate a number of existing businesses, require that those businesses be bulldozed and destroyed, that property be acquired through eminent domain process. The county determined, and I think reasonably so, that that was an impractical resolution, certainly within its purview under CEQA to make that determination as long as it's supported by substantial evidence. And clearly it is supported by evidence both in the EIR and in the record. The county concluded in its findings that the acquisition, demolition, and relocation costs would likely be the highest of all the sites studied. But why does highest make any difference? What? Highest doesn't necessarily make it impractical. Well, it certainly factors into the equation. If you can't afford it, it's impractical. But that's not what it said. It couldn't afford it. It just said it was the highest cost. I mean, I didn't read it. I didn't read, and maybe you can point to someplace in the record, where there was a finding that this was financially impractical. The finding was it was the most costly. The finding the county made, and it's in the county's findings at 2 ER 122, two excerpts of record 122. It's in the administrative record at 152. The county rejected the alternative being the Albertson site as infeasible because there would likely be negative impacts on the view shed of Lake Tahoe and because there would be a need to move an extensive number of local businesses, which would be extremely costly. Yeah, but there are no cost figures associated with this. It just said it's going to be costly. It didn't say it was going to be impractical. I mean, I don't mean to quarrel with you, but the cases seem to say, I agree with Judge Fernandez, the cases seem to set a different standard for this. I think it's reasonable to assume that the demolition and the relocation of an existing shopping center is going to be expensive. I mean, CEQA doesn't prohibit the use of common sense. Common sense tells you that's going to be an expensive undertaking. No, but it says what is required, I'm quoting, is evidence that the additional costs or lost profitability are sufficiently severe as to render it impractical to proceed with the project. I didn't see that kind of language in there. It just said it was the most costly. We'd have to tear down some businesses. Not that that necessarily couldn't meet the standard, but I just didn't see much in the way of factual support. Not just some businesses. The only large-scale grocery store in Tahoe City would be required to be demolished. Where does it say that? That's in the Environmental Impact Report 3ER362. No, where does it say it's the only large scale? That's exactly it. The development of the transit center on the Albertson site may result in loss of the city's only large-scale grocery store. Well, your time has expired. Thank you. Any further questions? Oh, within the western portion of Tahoe City. I just wanted to finish that sentence. Yeah, that's what I thought. Your Honors, with an immense record, I'll try to respond in order. I guess after several decades of practicing against the government, I always keep in mind Justice Brandeis' great quote, which was admittedly in a more serious context than this one. But you should always be on guard when the government asserts its purposes are beneficent. None of us wants more pollution at Lake Tahoe. The whole premise of Section 4F is that if there's a better way to attain the project without using the recreation, that is to say, if you don't destroy the village in order to save it, you should take that route. Of course, we haven't even gotten that far in this case because they're trying to right themselves out of having to do that. But the fact is that in 1969, I am sure that the City of Memphis and the Federal Highway Administration had many compelling reasons for constructing Interstate 40 through the Overton Park. But again, we are not even there. Yes, the Sierra Club case is really where we should focus because I think when one reads this Court's words written and why this case has attained such respect to the point where it even now forms the basis for the new FHWA regulations that were not affected when this case was being decided in the administrative process, talks about the need for concurrent planning. I don't think 4F can be read to say, under any of its exceptions, that when you create a recreational area, then after the fact, you can nibble away at it by having some so-called joint planning. Well, this is sort of an unusual situation because this area was not really a true recreational area when the Forest Service took it over. It had recreational aspects, but they had a liquor store, it had a trailer park, it had a miniature golf course. Yes, sir. I mean, so it's just sort of an odd circumstance. When they acquire this land, they say, we're going to convert it to some recreational use, and then they identify a bus center, why that isn't sufficient to constitute joint planning, even though the scope changed. Two answers, Your Honor. First of all, if we are going to allow that, let's look at the bus stop that they picked on. Let's not allow this exception to say that then in 20 or 30 years they could come back later and say, we want to use 40 of the 60 acres. There is no way to distinguish what they are actually trying to justify in this case from that hypothetical. But the answer, Your Honor, is really in this Court's words in the Sierra Club case. Section 4F is meant to discourage a new road, and in this case we're going to say transit facility, where the community has already decided that a park should exist. What matters is that in 1984, this recreational site was, to use the language of the regulations, established. And yes, it might have been a mess at that point, but that is not a justification to turn it back into a mess. The community was thrilled that this happened. As the Court can see by reading the 1983 EIS, it was by no means obvious that the Forest Service would be the recipient of this historically challenged land, really land with a marvelous history. And people were grateful that it was going to be put to its highest use as recreation. And incidentally, would there be a bus stop? Would there be parking for use on the site? Yes. Would there be federal funding of a transit project that is anti-recreational? I will just read, Your Honors, from page 1085 at volume 5 of the EI, of the record. An attendant should staff a kiosk placed at the entrance. The attendant would ask arriving drivers their purpose for parking in the area. As a footnote, I don't even want to get into the enforcement issues. And allow access to persons indicating their intent to take a transit bus or walk or bicycle to Tahoe City. Persons indicating their intent to use watercraft or to use the bike trail would be prohibited. Now, this is a problem we've had in this case from the beginning. It's a matter of just reading the English language for what it says. The county and the government argue that on page 153 of the excerpts of record, the county said that overall this is the best combination. But this is what the rest of the quote says if you start two sentences earlier. There are a number of locations that might work just fine, but you would have to relocate a business and deal with the impacts associated with that kind of relocation. So we feel that the project that's proposed is the best combination. So that is the context in which they are arguing. And by the way, it is not at all clear that if the transit facility were to be located where Albertsons is, that one would have to remove Albertsons. There is a huge amount of space there. That issue has not been addressed because they wrote themselves, if you will, the exception. Your Honor, finally, on Sierra Club, I did mean to make one more point. I didn't make it in my argument in chief because I was not sure that the government was asking this court to essentially rewrite the Sierra Club case and no longer keep it confined. The case is quite clear that the joint planning exception is confined to constructive use. Now, as we understand Ninth Circuit doctrine, if the government is now asking the court to modify this case or expand this case, it's got to go to a whole panel of this court and cannot ask this panel essentially to overrule or modify its predecessors. Your Honor, even in 1986, the argument was made, and Your Honor asked the question, well, when could they first start planning for this? And their answer was, well, in 1986, we did have an assessment. Well, let's look at what they did in 1986. In 1986, they made a decision on the 64-acre tract, and I'm reading from page 1718 of Volume 7 of the administrative record. And the forest supervisor adopted the community alternative. And this is what the community alternative is, a walk in public beach, a visitor information and interpreter center, a trailhead, a river access point for private rafting parties, parking for approximately 60 cars west of Highway 89 to fill the parking needs generated by the visitor center, trailhead, bike trails, and river access, and finally, bike trails to connect with the system. Your Honors, in the forest supervisor's own description of the community alternative that he adopted on November 19, 1986, there is not one word about a 2-acre transit center. As I said at the beginning of our argument, we think this post-1984 history is not relevant. But even if you examine it, it does not show that there was an intention to reserve what is now being asked for. And finally, the argument was made about TRPA. And yes, we recognize that the Tahoe Regional Planning Agency has an important role in the basin. And I'm looking right here at the supplemental environmental report, and I'm looking at page 109 of that report, and it is the Tahoe Regional Planning Agency's management for unit number 174, the 64-acre tract. And what does it say? It says that there will be parking to serve the uses of recreation at the site. There is nothing in the TRPA plan that makes reference to parking for the merchants in Tahoe City. And finally, well, it is ironic that the county's argument is that, well, we're only going to restrict the parking during the most important times of the day, the most important times of the year. I mean, I'm generally a water lawyer, not a land-use lawyer, but you try to plan your water management for dealing with the moment of greatest demand. And it will hardly satisfy the public if they're told that, well, there are only, you know, maybe 15 percent of the hours a year when you're prohibited, but these are the ones that really count. And finally, Your Honors, I think the Court's dialogue on CEQA has it exactly right. You have to combine CEQA with the substantive mandate. And if the substantive mandate takes costs off the table, then the county does have to reassess its feasibility determinations based on that factor. Thank you, Counselor. Thank you very much. I want to thank everyone for their arguments and briefing. It's an interesting case. And we'll be in recess for the morning.
judges: Fernandez, Nelson, Thomas